**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| REBECCA DUMLER AND DENNIS DUMLER, | No. C17-2033-LTS |
| Plaintiffs, | |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| WRIGHT MEDICAL TECHNOLOGY, INC. and WRIGHT MEDICAL GROUP, INC., | |
| Defendants. | |

*TABLE OF CONTENTS*

I.      INTRODUCTION..................................................................... 2

II.     FACTUAL OVERVIEW ............................................................ 2

III.    PROCEDURAL HISTORY ......................................................... 3

IV.     APPLICABLE STANDARDS ...................................................... 3
        A.    *Personal Jurisdiction* ................................................... 3
        B.    *Failure to State a Claim* .............................................. 6

V.      DISCUSSION........................................................................ 8
        A.    *Motion to Dismiss for Lack of Personal Jurisdiction*....................... 8
              1.    *Intentional Tort Involving Iowa Resident*............................ 9
              2.    *Statements in SEC Filings* ........................................ 10
              3.    *Alter Ego* ........................................................ 12
              4.    *Other Cases*....................................................... 15
              5.    *Jurisdictional Discovery and Leave to Amend Complaint* .................................................... 16
        B.    *Motion to Dismiss and Strike*....................................... 16
              1.    *Count I – Negligent Design* ....................................... 17
              2.    *Count II – Strict Products Liability: Manufacturing Defect*...................................................... 19
              3.    *Count VI – Fraudulent Misrepresentation*.......................... 21
              4.    *Count VIII – Punitive Damages*.................................... 26

VI.     CONCLUSION ..................................................................... 28

# I.    INTRODUCTION

This case is before me on a motion (Doc. No. 6) to dismiss for lack of personal jurisdiction by defendant Wright Medical Group, Inc. (WMG), and a motion (Doc. No. 7) by both defendants to dismiss Counts I, II, III, IV, VI and VIII for failure to state a claim and to strike plaintiffs' demand for pre-judgment interest.  Plaintiffs have filed resistances (Doc. Nos. 15, 16) and defendants have filed replies (Doc. Nos. 22, 24).  The parties have not requested oral argument and I do not find it to be necessary.  *See* L.R. 7(c).

# II.    FACTUAL OVERVIEW

This case involves a Profemur hip implant, which plaintiffs allege was defectively designed and resulted in bodily injury to plaintiff Rebecca Dumler due to corrosion and metal debris and ion cast off from the stem and neck components.  Doc. No. 2 at 1.  Defendants WMG and Wright Medical Technology, Inc. (WMT), are both Delaware corporations with their principal places of business in Tennessee.  *Id.* at 2.  WMT is a wholly-owned subsidiary of WMG.  *Id.*

Plaintiffs allege that the Profemur Titanium Modular Necks were first patented by Cremascoli Ortho Group and marketed by it in 1986.  *Id.* at 7.  In December 1999, WMG acquired Cremascoli and its products, including the Profemur line of hip products.  After the acquisition, WMG re-designed the Profemur modular artificial hip stem and modular neck and expanded the line to include additional models or versions of Profemur stems and modular necks.  *Id.*  The necks continued to be manufactured with titanium alloy.  WMG then branded the product as the Wright Medical Profemur Total Hip System.  In 2001, it re-styled the modular necks' mid-body.  *Id.*  After August 25, 2009, WMG began to offer the Profemur modular necks in the United States.  These were made of a cobalt-chromium (CoCr) alloy instead of titanium.  *Id.*

In 2011, a Profemur CoCr Modular Neck and a titanium stem were implanted in plaintiff Rebecca Dumler and allegedly caused injuries and damages due to corrosion

between the CoCr neck and titanium stem. Specific allegations relating to personal jurisdiction and plaintiffs' claims will be discussed in the analysis below.

## III.    PROCEDURAL HISTORY

Plaintiffs filed an eight-count complaint (Doc. No. 2) on June 29, 2017, naming both WMG and WMT as defendants. The claims include:

- Count I – Negligent Design and Failure to Warn or Instruct
- Count II – Strict Products Liability: Manufacturing Defect
- Count III – Breach of Express Warranty
- Count IV – Breach of Implied Warranties of Merchantability
- Count V – Negligent Misrepresentation
- Count VI – Fraudulent Misrepresentation
- Count VII – Loss of Consortium
- Count VIII – Punitive Damages

Doc. No. 2. Plaintiffs invoke the court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Doc. No. 2 at 3.

After being served, WMG filed its motion (Doc. No. 6) to dismiss for lack of personal jurisdiction and both defendants filed their motion (Doc. No. 7) to dismiss and motion to strike.

## IV.    APPLICABLE STANDARDS

### A.    Personal Jurisdiction

In order to properly allege personal jurisdiction, "a plaintiff 'must state sufficient facts in the complaint to support a reasonable inference that the defendant[ ] can be subjected to jurisdiction within the state.'" *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004)), *cert. denied*, 543 U.S. 1147 (2005) (quoting *Block Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 259 (8th Cir. 1974)). In resisting a Rule 12(b)(2) motion, the plaintiff has the burden of proving facts supporting such jurisdiction. *Wells*

*Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir.), *cert. denied,* 562 U.S. 962 (2010). The court may consider the allegations of the complaint along with any affidavits and exhibits submitted by the parties. *Id.* The plaintiff's burden, in the absence of an evidentiary hearing, is to make a "minimal" prima facie showing of personal jurisdiction. *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592 (8th Cir. 2011). The court "must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in its favor in deciding whether the plaintiff has made the requisite showing." *Id.*

In a diversity case, such as this, personal jurisdiction exists "only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." *Dever*, 380 F.3d at 1073 (internal quotation marks omitted). Iowa Rule of Civil Procedure 1.306[1] authorizes the exercise of personal jurisdiction to the full extent allowed by the United States Constitution, meaning the court's inquiry is limited to whether the exercise of personal jurisdiction comports with due process. *Wells Dairy*, 607 F.3d at 518 (citing *Hammond v. Fla. Asset Fin. Corp.*, 695 N.W.2d 1, 5 (Iowa 2005)).

In general, due process requires that a nonresident defendant have at least "certain minimum contacts" with the forum state to support the exercise of personal jurisdiction. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Those contacts must be sufficient that requiring the defendant to litigate in the forum state would not "offend traditional notions of fair play and substantial justice." *Id.* at 316 (internal quotation marks and citation omitted). They "must come about by an action of the defendant purposefully directed toward the forum State." *Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal.*, 480 U.S. 102, 112 (1987) (internal citations omitted).

---

[1] Which provides, in relevant part:

> Every corporation, individual, personal representative, partnership or association that shall have the necessary minimum contact with the state of Iowa shall be subject to the jurisdiction of the courts of this state.

Iowa R. Civ. P. 1.306.

This "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts," or due to "the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (citations omitted).  If the defendant made the deliberate choice to "engage[] in significant activities within a State," or to create "'continuing obligations' between himself and residents of the forum," then "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 475-76 (citations omitted).  Thus:

> By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit[.]"

*Id.* at 472-73 (citations omitted).

The Eighth Circuit Court of Appeals applies a five-factor test to determine whether a defendant's contacts with the forum state are sufficient to establish personal jurisdiction. *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 911 (8th Cir. 2012).  Those factors are: (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relationship of those contacts with the cause of action; (4) the forum state's interest in providing a forum for its residents; and (5) the convenience or inconvenience to the parties.  *Id.* (citing *Precision Const. Co. v. J.A. Slattery Co., Inc.*, 765 F.2d 114, 118 (8th Cir. 1985)).  The first three factors are considered to be of primary importance.  *Precision Const. Co.*, 765 F.2d at 118.

Personal jurisdiction can be either general or specific.  General jurisdiction arises when a nonresident maintains "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).  Under those circumstances, jurisdiction over the nonresident is appropriate even when the claims at issue do not arise out of or relate to its activities in the forum state.  *Id.* at 414-15.

Specific jurisdiction arises "when the defendant purposely directs its activities at the forum state and the litigation 'result[s] from injuries … relating to [the defendant's] activities [in the forum state.]'" *Myers*, 689 F.3d at 912-13 (quoting *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008)). Specific jurisdiction "requires a relationship between the forum, the cause of action, and the defendant. *Id.* at 912 (citing *Helicopteros Nacionales de Colombia*, 466 U.S. at 414). The third factor of the five-factor test "distinguishes between specific and general jurisdiction." *Id.* at 911 (citing *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010)).

The Eighth Circuit has rejected the so-called "proximate cause" test for specific jurisdiction, under which the exercise of jurisdiction is appropriate only if the defendant's contacts with the forum was the legal cause of the plaintiff's injuries. *Id.* at 912-13. Instead, the third factor is satisfied so long as (a) the defendant purposely directed its activities at the forum state and (b) the litigation results from injuries relating to the defendant's activities in the forum state. *Id.* (citation and quotation omitted).

## B.    *Failure to State a Claim*

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)], the pleading standard Rule 8 announces but does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.

6

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.*, at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n. 4 (8th Cir. 2010)). While *factual* "plausibility" is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g., Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Ball v. Famiglio*, 726 F.3d 448, 469 (3d Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Intern., Ltd. v. Lee*, 1 F. Supp. 3d 927 (N.D. Iowa 2014).

When a complaint does not state a claim for relief that is plausible on its face, the court must consider whether it is appropriate to grant the pleader an opportunity to replead. The rules of procedure permit a party to respond to a motion to dismiss by amending the challenged pleading "as a matter of course" within twenty-one days. *See* Fed. R. Civ. P. 15(a)(1). Thus, when a motion to dismiss highlights deficiencies in a pleading that can be cured by amendment, the pleader has an automatic opportunity to do

so.  When the pleader fails to take advantage of this opportunity, the question of whether to permit an amendment depends on considerations that include:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan v. TransGuard Ins. Co. of Am., Inc.*, 978 F. Supp. 2d 974, 982 (N.D. Iowa 2013).

# V.    DISCUSSION

## A.    *Motion to Dismiss for Lack of Personal Jurisdiction*

WMG argues it should be dismissed for lack of personal jurisdiction because it is merely a holding company and has no connection to Iowa.  It states it has no employees, offices or real property in Iowa.  It also does not transact any business in Iowa.  It argues that it is separate from WMT and that statements in SEC filings regarding the corporate structure as a whole are insufficient to subject WMG to jurisdiction in Iowa.  It has submitted an affidavit from Amy Reeves, Senior Director and Controller at WMT, in support of its motion.  Doc. No. 6-1.  Reeves' affidavit states that WMT is a wholly-owned subsidiary of WMG and that WMG did not and does not design, manufacture, label, market, distribute, sell or provide warnings related to the Profemur hip implant components at issue.  *Id.*

Plaintiffs argue WMG is subject to specific personal jurisdiction[2] in Iowa because: (1) it intentionally sold the Profemur hip device in Iowa and that device was implanted in an Iowa resident at an Iowa hospital, (2) its SEC filings claim it is the designer, manufacturer and marketer of Profemur products and (3) WMT is the alter ego of WMG

---

[2] Plaintiffs do not argue WMG is subject to general jurisdiction.

and the corporate veil should be pierced. I will address each alleged basis for personal jurisdiction separately.

### 1. *Intentional Tort Involving Iowa Resident*

First, plaintiffs state that WMG intentionally sold the Profemur hip device in Iowa, where it was implanted in an Iowa resident at a hospital located in Waterloo, Iowa. They allege the device failed and surgical components had to be replaced at another Iowa hospital. WMG argues that it does not design, market or advertise the Profemur product in Iowa or any other state. It claims that any acts establishing personal jurisdiction over WMG would have to be based on WMT's contacts with Iowa. Because WMT does not challenge the court's personal jurisdiction over it (and affirmatively states that it did manufacture, market and sell the Profemur hip device), *see* Doc. No. 6-1 at 3, plaintiffs' argument misses the mark. It is undisputed that the Profemur product is marketed and sold in Iowa. The dispute is over who performs those activities. WMG has submitted an affidavit stating that it does not design, manufacture, label, market, distribute, sell or provide warnings related to the Profemur hip implant components. *See* Doc. No. 6-1 at 3. Plaintiffs' reliance on mere allegations is insufficient to rebut these assertions. *See Dever*, 380 F.3d at 1072 (reasoning that once a defendant controverts or denies jurisdiction, plaintiff cannot rely on the pleadings alone, but must come forward with affidavits and exhibits to make a prima facie showing of personal jurisdiction).

Plaintiffs also argue that with regard to their fraud claim, WMG's acts were intentional, expressly aimed at Iowa through third-party sales representatives in Iowa and caused harm in Iowa, which WMG knew was likely to happen given that it supplied the Profemur device in Iowa. Again, this argument misses the point. WMG does not deny that those alleged actions would establish personal jurisdiction, if WMG performed them. Instead, WMG has established by affidavit that it does not perform those actions, in Iowa or elsewhere, and argues that it cannot be subject to personal jurisdiction by way of WMT's alleged actions. Plaintiffs have not produced any affidavits or exhibits in support

of their position that WMG performed the alleged actions. As such, I find the Profemur device's presence in Iowa is an insufficient basis for establishing personal jurisdiction over WMG.

### 2. *Statements in SEC Filings*

The only evidence plaintiffs have produced in support of personal jurisdiction over WMG, beyond mere allegations, are SEC filings from 2001 and 2014. Plaintiffs argue these filings demonstrate that WMG takes ownership of the Profemur product and any associated liability. The 2001 filing is a 10-K form submitted by "Wright Medical Group, Inc." *See* Doc. No. 16-2. The form references the "Company" throughout, which is identified only as Wright Medical Group, Inc. at the beginning of the document. *See id.* at 3. It states that it acquired majority ownership of the Company's predecessor, Wright Medical Technology, Inc. in December 1999. *Id.* at 4. It then goes on to describe that it acquired Cremascoli in December 1999. Plaintiffs focus on the opening paragraph providing an overview of the business. That paragraph states: "Wright Medical Group, Inc. (the "Company") is a global orthopaedic device company specializing in the design, manufacture and marketing of reconstructive joint devices and bio-orthopaedic materials." *Id.* at 3. With regard to the Profemur product, the 10-K states:

> Modular hip systems are growing in popularity, especially in revision replacement hip implant procedures. The PROFEMUR-TM-R was designed by Cremascoli for the European market. Although the Company is currently selling this product in the U.S., the Company is also developing a modified version and instrumentation to address the needs of U.S. surgeons. The new system, the PROFEMUR-TM-USA Modular Hip will capitalize on the successful clinical history of the current PROFEMUR-TM-R product while incorporating new technology into the design.

*Id.* at 16. Plaintiffs rely on these statements to demonstrate that WMG acquired the Profemur product and that it admitted to selling the product in the United States.

Plaintiffs also reference a 10-Q form dated April 30, 2014. *See* Doc. No. 16-7. This form, in a section titled "Product Liability," states:

> We have received claims for personal injury against us associated with fractures of our PROFEMUR® long titanium modular neck product (PROFEMUR® Claims). The overall fracture rate for the product is low and the fractures appear, at least in part, to relate to patient demographics. Beginning in 2009, we began offering a cobalt-chrome version of our PROFEMUR® modular neck, which has greater strength characteristics than the alternative titanium version. Historically, we have reflected our liability for these claims as part of our standard product liability accruals on a case-by-case basis. However, during the quarter ended September 30, 2011, as a result of an increase in the number and monetary amount of these claims, management estimated our liability to patients in North America who have previously required a revision following a fracture of a PROFEMUR® long titanium modular neck, or who may require a revision in the future. Management has estimated that this aggregate liability ranges from approximately $17 million to $28 million. Any claims associated with this product outside of North America, or for any other products, will be managed as part of our standard product liability accruals.

*Id.* at 41-42. "We" or "us" is not defined in this form, however, the form states that "[t]he accompanying unaudited condensed consolidated interim financial statements include our accounts and those of our domestic and international subsidiaries, all of which are wholly-owned subsidiaries." *Id.* at 14.

I do not find that these forms establish personal jurisdiction as to WMG. First, they are outdated and plaintiffs have cherry-picked phrases out of them to support their position. Second, it is common practice for annual reports to describe the business of a parent and its subsidiaries. *See e.g.*, *Calvert v. Huckins*, 875 F. Supp. 674, 679-80 (E.D. Cal. 1995) ("[C]onsolidating the activities of a subsidiary into the parent's annual reports is a common business practice. It is allowed by both the Internal Revenue Service and the Securities and Exchange Commission, and it is recommended by generally accepted accounting principles."). These consolidated reports do not demonstrate WMG contacts with the forum state. *See e.g.*, *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 824 (D. Ariz. 2016) ("Courts have recognized that companies may omit distinctions between related corporate entities in their SEC filings, and still insist on these distinctions when haled into court.").

Indeed, WMG explains that it has no operations of its own, as referenced in the Reeves affidavit, such that its annual SEC report is based on operations of its functioning subsidiaries. *See* Doc. No. 20-1 at 4, n.4. It further explains that WMT is not a publicly traded entity and thus does not file its own 10-K and 10-Q forms. *Id.* The 2014 10-Q form submitted by plaintiffs specifically states that it includes the accounts of its subsidiaries. *See* Doc. No. 16-7 at 14. The 10-Q form also states that it "should be read in conjunction with the accompanying unaudited financial statements, our Annual Report on Form 10-K for the year ended December, 2013" and other documents. *See* Doc. No. 16-7 at 50. The 2013 10-K form (submitted by WMG) states, "Wright Medical Group, Inc., through [WMT] and other operating subsidiaries (Wright or we), is a global specialty orthopaedic company, that provides extremity and biologic solutions that enable clinicians to alleviate pain and restore their patients' lifestyles." Doc. No. 24-4 at 6. Finally, WMG has submitted its 10-K forms from 2009 (the year plaintiffs claim WMG began selling the Profemur CoCr device in the U.S.) and 2011 (the year Rebecca Dumler had her Profemur hip implanted). Both state, "Wright Medical Group, Inc., through Wright Medical Technology, Inc. and other operating subsidiaries (Wright), is a global orthopaedic medical device company specializing in the design, manufacture and marketing of devices and biologic products for extremity, hip, and knee repair and reconstruction." *See* Doc. Nos. 24-2 at 6 and 24-3 at 6. I do not find that the selected phrases from the 2001 10-K form and 2014 10-Q form are sufficient to establish personal jurisdiction over WMG.

### 3.     *Alter Ego*

Plaintiffs also rely on the 2014 10-Q form to argue that WMG and WMT are one and the same. They explain that the form indicates WMG realized a financial gain from its sale of OrthoRecon (the manufacturer of its hip and knee products). They argue that this is inconsistent with WMG's assertion that WMT was the entity that sold OrthoRecon. Plaintiffs speculate "whether WMG is now leaving its subsidiary, WMT, an empty shell"

and whether "WMG 'raided' the coffers of WMT of the $285 million ultimately realized in the sale of the Profemur hip product business." *See* Doc. No. 16 at 13. For this reason, they claim WMT acted as the alter ego of WMG and the corporate veil should be pierced.

WMG explains that statements regarding the sale of the OrthoRecon division refers to the corporate organization as a whole and not WMG or WMT specifically. It notes that WMT does not file its own annual or quarterly SEC report. WMG argues that the remainder of plaintiff's arguments are speculation, which are insufficient to make a prima facie showing of personal jurisdiction or justify jurisdictional discovery. *See Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 598 (8th Cir. 2011) ("[W]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery.").

Personal jurisdiction "can be based on the activities of the nonresident corporation's in-state subsidiary, but only if the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 648-49 (8th Cir. 2003). "If the resident subsidiary corporation is the alter ego of the nonresident corporate defendant, the subsidiary's contacts are those of the parent corporation's, and due process is satisfied." *Id.* at 649. State law determines whether the corporate veil may be pierced. *Epps*, 327 F.3d at 649. The facts to consider include whether:

(1)    the corporation is undercapitalized

(2)    the corporation lacks separate books

(3)    its finances are not kept separate from individual finances, or individual obligations are paid by the corporation,

(4)    the corporation is used to promote fraud or illegality

(5)    corporate formalities are not followed

(6)    the corporation is a mere sham

*Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 810 (Iowa 1978) (citing *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 637 (8th Cir. 1975)).

WMG argues that plaintiffs have not alleged any of the above factors in their complaint and that the facts alleged in their resistance are insufficient to pierce the corporate veil. Plaintiffs rely on the following assertions:

- Through its sale of the OrthoRecon business to Microport, WMG has potentially left WMT grossly undercapitalized. *See* Doc. No. 16-8.

- The officers of WMT, who include key WMG officers, were not acting in WMT's best interest by potentially leaving it unable to satisfy Wright Profemur judgments.

- WMG treated WMT's assets as its own, claiming that it, not WMT, saw a financial profit from the sale of OrthoRecon. Such claims demonstrate the corporate formalities for WMT are not faithfully observed. *See* Doc. No. 16-7 at 24-26.

- WMG's statements characterize WMT as a department or division of WMG, and WMG treats WMT's business as its own. *See* Doc. Nos. 16-2 and 16-7 at 24-26.

- WMG is alleged to have engaged in intentional, fraudulent conduct. *See* Doc. No. 2 at ¶¶ 46-73; 140-46.

Doc. No. 16 at 15-16.

These assertions fall short of establishing that WMG is the alter ego of WMT. With regard to WMT's capitalization and financial status, plaintiffs have offered nothing more than conjecture. Their speculation concerning the sale of the OrthoRecon business assumes that WMG sold a WMT asset and that WMG kept the proceeds. However, they have provided no documentation to back up this theory and, as discussed above, the reference to "we" in the SEC filings can fairly be attributed to WMG and its subsidiaries. This collective reference does not establish that corporate formalities have been ignored or that WMG is the alter ego of WMT. *See Schultz v. Portfolio Assocs., Inc.*, No. 12-

CV-2022-LRR, 2012 WL 5332194, at *5 (N.D. Iowa Oct. 29, 2012) (finding that SEC filings' reference to parent and subsidiary collectively is not a sufficient reason to pierce the corporate veil). The fact that WMG and WMT share some of the same officers and directors is also not dispositive. *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (noting it is a well-established principle of corporate law "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the corporations separately, despite their common ownership.").

As to plaintiffs' fourth assertion, neither the 2001 10-K form nor the 10-Q form cited by plaintiffs refer to WMT as a "department" or "division" within those forms. Plaintiffs' final assertions refer to allegations in their complaint, which are insufficient to make a prima facie showing of personal jurisdiction in light of the Reeves affidavit submitted by WMG. That affidavit states that WMG and WMT are separate corporate entities with separate accounting and banking records. *See* Doc. No. 6-1 at 3. For these reasons, I find plaintiffs have failed to establish personal jurisdiction over WMG based on an alter ego or piercing the corporate veil theory.

### 4. Other Cases

Next, plaintiffs attempt to establish personal jurisdiction by pointing out that WMG has insisted on litigating in an injured plaintiff's home state in other cases. *See* Doc. No. 16-6 (a motion to dismiss pursuant to the doctrine of forum non conveniens filed by WMG in a Tennessee case). WMG argues these filings have no bearing on specific jurisdiction because they do not establish any WMG contacts with Iowa. I agree. *See Wells Dairy, Inc.*, 607 F.3d at 520, n.3 (acknowledging that "the determination that personal jurisdiction exists turns on the facts of each case"). WMG's position in a different case, in a different forum, with different plaintiffs and different facts has no bearing on whether personal jurisdiction exists over WMG in this case.

### 5.     *Jurisdictional Discovery and Leave to Amend Complaint*

Plaintiffs alternatively request jurisdictional discovery and leave to amend their complaint. Jurisdictional discovery is warranted only "if the facts necessary to resolve the jurisdictional inquiry are either unknown or can be genuinely disputed." *F.D.I.C. v. Dosland*, 50 F. Supp. 3d 1070, 1077 (N.D. Iowa 2014). I do not find that to be the case here. Plaintiffs have not offered any evidence to suggest that discovery or an amended complaint would resolve unanswered questions regarding WMG's connections to Iowa or its relationship with its subsidiary, WMT. Those questions have been resolved by the Reeves affidavit and remain undisputed. I am unconvinced that jurisdictional discovery would reveal new information on those issues and find that it would only serve to delay this case.

In sum, I find that plaintiffs have failed to meet their burden of making a prima facie showing that personal jurisdiction exists over WMG. It is undisputed that WMG is not located in Iowa, does not sell products in Iowa, does not market to Iowa residents or engage in any other conduct that was purposefully directed toward Iowa. Its only connection to Iowa is through the actions of its subsidiary, WMT. This relationship, without more, is insufficient to establish personal jurisdiction over WMG. As such, WMG's motion to dismiss for lack of personal jurisdiction will be granted.

### B.     *Motion to Dismiss and Strike*

Both defendants seek dismissal of various counts based on untimeliness under Iowa's five-year statute of limitations and improper pleading. The motion does not address Counts V or VII. Plaintiffs do not resist the motion with regard to Counts III and IV (based on the five-year statute of limitations) or the motion to strike plaintiffs' demand for pre-judgment interest. As such, those counts will be dismissed and the demand stricken.

As for the remaining challenged claims (Counts I, II, VI, and VIII), defendants argue they are not adequately pled under the heightened pleading standards in *Twombly*

and *Iqbal* (and under Federal Rule of Civil Procedure 9(b) with regard to plaintiffs' fraudulent misrepresentation claim). Defendants also argue that to the extent Count I alleges both a negligent design and negligent failure to warn claim, the negligent design part must be dismissed because plaintiffs have not pled any facts to support the existence of a reasonably safer alternative design.

### 1.    *Count I – Negligent Design*

Beginning with Count I, defendants argue plaintiffs have failed to properly plead a negligent design claim[3] because they have not pleaded any facts relating to the existence of a reasonably safer alternative design. Iowa has adopted the Restatement (Third) of Torts: Product Liability sections 1 and 2 related to product defect cases. *See Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002). Under these sections, a design defect claim requires proof that:

> the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

Restatement (Third) of Torts: Prod. Liab. § 2(b) (1998). Plaintiffs argue they alleged at least two reasonable alternative designs in their complaint, including (1) a traditional monoblock stem in lieu of separate stem and neck components and (2) a neck made of titanium, instead of CoCr, such that the same metal alloy is used in the stem and neck components to eliminate corrosion.

The sections of the complaint mentioning these alternative designs read as follows:

71.    Product complaint data reported to Wright prior to June 8, 2011 indicated an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur CoCr Modular Necks when

---

[3] Count I consists of a negligent design and failure to warn claim. Defendants challenge only the negligent design aspect of this claim.

coupled with Wright Medical Profemur titanium stems, as compared to traditional monoblock stems.

72.     Product complaint data reported to Wright prior to June 8, 2011 indicated an increased risk of adverse events due to galvanic corrosion, as compared to traditional titanium necks when coupled with a Wright Medical Profemur hip stems.

*See* Doc. No. 2 at 14.  These allegations are included in the general factual allegations under the title "The Wright Medical Profemur Hip."  Doc. No. 2 at 8.  They are not specifically included in the allegations under Count I, but Count I incorporates by reference the facts alleged in paragraphs 1-90.  *Id.* at 17.  Plaintiffs also reference paragraph 78 and 80, which allege:

78.     The foreseeable risks of harm posed by Wright Medical's Profemur CoCr Modular Neck could have been reduced or avoided by Defendants as other reasonable alternative designs are available, and reasonable alternative designs are manufactured and marketed by Defendants.

80.     Defendants were negligent in the failure to warn patients and/or surgeons that they had received product complaint data that did indicate an increased risk of adverse events due to taper junction fretting and corrosion, as compared to other available safe alternative devices.

*Id.* at 15.  Defendants complain that these paragraphs taken together do not sufficiently allege that a monoblock stem or titanium neck are reasonable alternative designs to the Profemur CoCr neck component at issue and that these allegations fail to put them on notice of the claims against them.  I disagree.

Defendants argue that plaintiffs' design defect claim is legally deficient because it does not include an allegation that reasonably safer alternative designs are available.  To the extent the complaint does allege that reasonably safer alternative designs are available, defendants argue the claim is factually deficient because it does not sufficiently allege what those designs are.  There is no legal deficiency because paragraph 78 clearly states that "other reasonable alternative designs are available, and reasonable alternative designs are manufactured and marketed by defendants."  *Id.*  Whether this paragraph sufficiently

identifies the designs they are referring to is a tougher question. It is unclear how many similar hip products defendants manufacture and market. However, paragraphs 71 and 72 identify at least two others designs (monoblock stems and traditional titanium necks) that performed better in comparison to the Profemur CoCr modular neck. While it would have been preferable for plaintiffs to identify these designs in paragraph 78, I find that the complaint as a whole provides sufficient notice of the designs plaintiffs allege are reasonably safer alternatives. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) ("the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."). Defendants' motion to dismiss the negligent design prong of Count I will be denied.

### 2. *Count II – Strict Products Liability: Manufacturing Defect*

With regard to Count II, defendants argue that plaintiffs have failed to allege "how the manufacturing of the particular product at issue departed from the intended product design." *See* Doc. No. 7 at 12 (citing *Estate of Thompson v. Kawasaki Heavy Indus., Ltd.*, 922 F. Supp. 2d 780, 789 (N.D. Iowa 2013)). Defendants argue plaintiffs have not pleaded any facts indicating how the Profemur Total Hip System that was implanted in Rebecca Dumler was different than other products in its propensity to cause the alleged injuries.

Manufacturing defects are different than design defects in that manufacturing defects involve an unintended configuration while design defects involve an intended configuration that may produce unintended and unwanted results. *See Linden v. CNH America, L.L.C.*, 673 F.3d 829, 834 (8th Cir. 2012) (citing *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989)). The Iowa Supreme Court has adopted the Restatement (Third) of Torts § 2(a) with regard to manufacturing defects. *See Wright*, 652 N.W.2d at 169. This section provides that a product contains a manufacturing defect "when the product departs from its intended design even though all possible care was

exercised in the preparation and marketing of the product." Restatement (Third) of Torts: Prod. Liab. § 2(a) (1998).

Plaintiffs point to paragraph 75 of the complaint, which alleges that the Profemur device implanted in Rebecca Dumler was "manufactured such that the tolerances between the stem and neck components did not comply with Wright's design specifications." *See* Doc. No. 2 at 14. This factual allegation was incorporated into the allegations specific to Count II. *Id.* at 20. Paragraph 103 under Count II also states:

> 103. The Wright Medical Profemur Total Hip System used in Plaintiff Rebecca Dumler's hip replacement surgery was supplied in a defective condition in its manufacture, such that it would experience motion, fretting and corrosion at the stem-neck juncture, rendering it unreasonably dangerous.

*Id.* Plaintiffs contend that these two paragraphs, taken together, clearly allege a physical flaw related to the tolerances that deviated from design specifications for the stem and neck components that resulted in the motion, fretting and corrosion. They argue this is sufficient to allege a plausible manufacturing defect claim under *Twombly* and *Iqbal*.

Similar to Count I, defendants allege both a legal and factual deficiency with regard to Count II. I find that paragraphs 75 and 103 provide the necessary allegations that (1) the product departed from its intended design and (2) the tolerances between the stem and neck components are the alleged physical flaw that departed from the intended design. Essentially, plaintiffs allege that the stem and neck component materials in Rebecca Dumler's implant were defective in that they were weaker than intended and caused motion, fretting and corrosion. I find that no more specificity is required at the pleading stage. Plaintiffs have alleged sufficient facts to establish the elements of a manufacturing defect and provided sufficient notice to defendants of the nature of the alleged defect.

### 3. Count VI – Fraudulent Misrepresentation

Defendants argue Count VI fails to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). This rule states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Fraudulent misrepresentation requires proof of the following elements:

(1)     defendant made a representation to the plaintiff

(2)     the representation was false

(3)     the representation was material

(4)     the defendant knew the representation was false

(5)     the defendant intended to deceive the plaintiff

(6)     the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation

(7)     the representation was a proximate cause of plaintiff's damages and

(8)     the amount of damages

*Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001). Defendants allege plaintiffs fail to identify who made the representation, when it was made and where it was published or made available to the general public. *See Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) (noting Rule 9(b) requires plaintiff to plead "the who, what, when, where, and how: the first paragraph of any newspaper story.").

Plaintiffs reference the following parts of their complaint in support of their fraudulent misrepresentation claim:

As to material, false representations, they allege that both defendants:

- "claimed that these cobalt chrome modular necks would result in less fretting than occurred with titanium modular necks." Doc. No. 2 at 9; ¶ 46.

- "claimed that the use of dissimilar metals, such as mating a CoCr modular neck with a titanium stem, would not result in galvanic corrosion, a

corrosion process not unlike what takes place with a car battery, at a level that would be problematic for patients." *Id.* at 10; ¶ 48.

- stated "[p]roduct complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion of fractures for PROFEMUR® CoCr Modular Necks." (quoting Wright Medical publication MH 1619-812). *Id.*; ¶ 52.

- "made false representations of material fact to Plaintiff and/or her healthcare providers as to the safety and efficacy of the Wright Medical Profemur® CoCr Modular Neck coupled with the Wright Medical Profemur® titanium modular [stem] in the Wright Medical Profemur® Total Hip System. Instead of disclosing the heightened risks of corrosion, failure, and permanent injury, Wright represented:
  o that there was no indication of an increased risk of adverse events due to taper junction fretting and corrosion
  o that lab testing guaranteed structural reliability and the absence of significant micromovement and of fretting corrosion
  o that product complaint data did not indicate an increased risk of galvanic corrosion for Wright Medical Profemur® CoCr modular necks when coupled with Wright Medical Profemur® titanium hip stems
  o that, [u]tilized in both primary and revision applications, the current [Profemur® modular] neck design has been successfully employed to improve surgical outcomes with no reported failures
  o that cobalt-chromium modular necks would result in less fretting than occurred with titanium modular necks and
  o that the Wright Medical Profemur® Total Hip System, including its component parts, were safe and effective, and were safer and more effective than other treatments for hip replacements. *Id.* at 26-27; ¶ 141.

With regard to defendants' knowledge that these representations were false, plaintiffs allege:

- "Prior to June 8, 2011, Wright had been informed that its Profemur® CoCr modular necks were corroding in patients to the extent that revision surgeries were necessary to remove the Profemur® CoCr Modular necks." *Id.* at 13; ¶ 67.

- "Product complaint data reported to Wright prior to June 8, 2011, indicated an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® CoCr Modular Necks when coupled with Wright Medical Profemur® titanium hip stems, as compared to traditional titanium necks." *Id.* at 14; ¶ 71.

- "Product complaint data reported to Wright prior to June 8, 2011, indicated an increased risk of adverse events due to galvanic corrosion, as compared to traditional titanium necks when coupled with [] Wright Medical Profemur® hip stems." *Id.*; ¶ 72.

With regard to defendants' intent to deceive, plaintiffs allege:

- "Defendants made these false representations with the intent of defrauding and deceiving the medical community (including implanting surgeon Dr. Gorsche, Plaintiff, and the public), and to induce the medical community, Plaintiff's implanting surgeon, Plaintiff and the public to utilize its Wright Medical Profemur® CoCr Modular Neck coupled with the Wright Medical Profemur® titanium modular stem as part of the Profemur® Total Hip System. Doing so constituted a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff and the public." *Id.* at 27-28; ¶ 143.

Finally, as to justifiable reliance, plaintiffs allege:

- "Plaintiff and her implanting orthopedic surgeon Dr. Gorsche justifiably relied upon Wright's false representations of material fact in deciding to utilize the Wright Medical Profemur® Hip System, including the CoCr modular neck and titanium modular stem." *Id.* at 25; ¶ 134.

- "Dr. Gorsche recommended the Wright Profemur® hip device to Plaintiff and indicated that the Wright Profemur® hip device was appropriate for her." *Id.* at 4; ¶ 15.

- "Plaintiff Rebecca Dumler reasonably relied upon Dr. Gorsche in deciding to proceed with hip replacement surgery and have Wright Profemur® hip device implanted in her." *Id.* at 5; ¶ 16.

- Defendants had superior knowledge of the dangers associated with their Profemur® CoCr neck but disregarded the truth. *Id.* at 13-14, 27; ¶¶

67, 71-72, 142.

- "Had Plaintiff or her healthcare providers known the true facts about the dangers and health risks of the Wright Medical Profemur CoCr Modular Neck coupled with the Wright Medical Profemur titanium modular stem as components of the Wright Medical Profemur Total Hip System, they would not have utilized said product. *Id.* at 28; ¶ 145.

Defendants argue that these allegations suffer from similar deficiencies as those in *Wright v. Brook Group Ltd.,* 114 F. Supp. 2d 797 (N.D. Iowa 2000). In *Wright*, plaintiffs sued seven tobacco companies alleging various claims and damages related to cigarette smoking. *Id.* at 803. This court found that plaintiffs had failed to plead a sufficient fraudulent misrepresentation claim because they failed to identify: (1) which defendants made the misrepresentations, (2) specific times when the misrepresentations were made (noting that far ranging periods such as 1950-1962 were not particular enough) and (3) where any of the alleged false statements were published or made available to the general public. *Id.* at 834.

Here, there are two defendants and one is a wholly-owned subsidiary of the other. While plaintiffs did not identify the specific defendant who made the representations, defendants state that WMG has no employees through which it can act. Therefore, it can be reasonably ascertained that WMT is the defendant to which plaintiffs are referring. With regard to the time and place of the alleged representations, Wright Publication MH 16190812 is directly quoted in paragraphs 52 and 67. Plaintiffs argue the remainder of the allegations come from defendants' joint marketing and sale of the Profemur device.

While plaintiffs have identified the who, what and where, I find their allegations fall short as to the when and how – specifically, in alleging facts to support scienter and justifiable reliance. With regard to scienter (whether defendants knew that their representations were false when they made them), plaintiffs allege that prior to June 8, 2011, defendants were aware of certain defects regarding the Profemur CoCr neck when coupled with titanium stems. They also allege that defendants made specific

representations and statements about the safety of the Profemur CoCr neck with titanium stem. Notably, however, plaintiffs fail to allege *when* these representations and statements were made and whether they were made *after* defendants had knowledge that there were defects with the device. *See* Doc. No. 2 at 9-14; 26-28. Without specifying the time period in which the alleged representations and statements were made, plaintiffs' allegations, if true, do not constitute fraudulent misrepresentation. *See Mitec Partners, LLC v. U.S. Bank Nat. Ass'n*, 605 F.3d 617, 621 (8th Cir. 2010) ("The elements of a claim for fraudulent misrepresentation under Iowa law are that defendant made a material misrepresentation *knowing* it was false and intending to deceive the plaintiff, and that plaintiff acted in justifiable reliance on the truth of the representation and suffered damages proximately caused by the representation.") (emphasis added).

Plaintiffs' allegations also do not specify how Rebecca Dumler and her surgeon, Dr. Gorsche, justifiably relied upon the alleged representations, just that they did. Plaintiffs do not specify whether they, and/or Dr. Gorsche, read Wright Publication MH 16190812 or learned of Wright's representations and statements through some other medium. Such conclusory allegations are insufficient under *Iqbal* and *Twombly*. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citing *Twombly*, 550 U.S. at 555.).

Based on these two deficiencies, Count VI fails to state "with particularity" the circumstances constituting fraud under Rule 9(b) and fails to state a claim under Rule 12(b)(6). The rules of procedure permit a party to respond to a motion to dismiss by amending the challenged pleading "as a matter of course" within twenty-one days. *See* Fed. R. Civ. P. 15(a)(1). Plaintiffs did not amend their complaint, nor did they seek leave to amend to address any deficiencies in their complaint. When the pleader fails to take advantage of this opportunity, the question of whether to permit an amendment depends on considerations that include:

whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan*, 978 F. Supp. 2d at 982.

Defendants' motion identified the above-described deficiencies. *See* Doc. No. 7 at 16 ("Even disregarding the generalities in these 'representations,' there is no information whatsoever in all of Count VIII[4] as to whether they were published and, if so, in what specific materials, when the statement were made out of the entire history of the device's existence, or to whom they were made."). If plaintiffs were aware of additional facts that could address those deficiencies, they had the opportunity – as a matter of right – to amend their complaint accordingly. They did not do so. Having considered the factors set forth in *Meighan*, I find it unnecessary to give plaintiffs another opportunity to amend Count VI. It will be dismissed.

### 4.    *Count VIII – Punitive Damages*

Defendants argue that as an initial matter, I should find that Tennessee law governs plaintiffs' demand for punitive damages. The choice of law rules of the forum state are binding. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). For tort claims, Iowa applies the "most significant relationship" test. *See Linden*, 753 F. Supp. 2d at 863 (citing *Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897 (Iowa 1996)). Plaintiffs argue Iowa has the most significant relationship while defendants argue Tennessee has the most significant relationship. I find it unnecessary to decide which law applies as the standards are similar and the outcome would be the same under Iowa or Tennessee law.

---

[4] Defendants mistakenly cite to plaintiffs' fraudulent misrepresentation claim as Count VII throughout their motion. The reference to Count VIII also appears to be a mistake as this section of defendants' brief addresses plaintiffs' fraudulent misrepresentation claim.

In Iowa, punitive damages may be awarded if plaintiffs prove by a "preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1. "Willful and wanton" conduct means:

> the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which is usually accompanied by a conscious indifference to the consequences.

*Mercer v. Pittway Corp.*, 616 N.W.2d 602, 617 (Iowa 2000) (quoting *Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 919 (Iowa 1990)). Defendants' conduct must constitute actual or legal malice. *Gibson*, 621 N.W.2d at 395. Under Tennessee law, plaintiffs must prove "by clear and convincing evidence that the defendant "acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 848 (Tenn. 2010).

Plaintiffs rely on the same allegations set forth in their fraudulent misrepresentation claim in support of their claim for punitive damages. As discussed above, I have found that plaintiffs' fraudulent misrepresentation claim falls short of Rule 9(b)'s requirements and fails to state a claim under Rule 12(b)(6) based, in part, on plaintiffs' failure to allege facts that defendants knew the statements they were making about the safety of the Profemur CoCr neck and titanium stem were false at the time they were made. As such, plaintiffs' claim for punitive damages also fails because plaintiffs have not alleged sufficient facts of willful and wanton conduct and malice under Iowa law, or facts demonstrating that defendants acted intentionally, fraudulently, maliciously or recklessly under Tennessee law. Count VIII fails to state a claim for punitive damages on which relief may be granted.

## VI.    CONCLUSION

For the reasons stated herein:

1.      WMG's motion (Doc. No. 6) to dismiss for lack of personal jurisdiction is **granted**.  Wright Medical Group, Inc., is hereby **dismissed** as a party to this case.

2.      Defendants' motion (Doc. No. 7) to dismiss and strike is **granted** in part and **denied** in part, as follows:

    a.      The motion is **granted** with regard to the following counts, which are hereby **dismissed**:

- Count III – Breach of Express Warranty
- Count IV – Breach of Implied Warranties of Merchantability
- Count VI – Fraudulent Misrepresentation
- Count VIII – Punitive Damages

    b.      The motion is **granted** with regard to plaintiffs' demand for pre-judgment interest, which is **stricken**.

    c.      The motion is **denied** with regard to the following counts, which will remain pending against defendant Wright Medical Technology, Inc. (along with Counts V and VII):

- Count I – Negligent Design and Failure to Warn or Instruct
- Count II – Strict Products Liability: Manufacturing Defect

**IT IS SO ORDERED.**

**DATED** this 26th day of January, 2018.

_____
Leonard T. Strand, Chief Judge